UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 14-80885-CIV-COHN

HERNAN DIEGO PANIAGUA RODRIGUEZ,

    Petitioner,

vs.

CINTIA SOLEDAD ROMERO,

    Respondent.

_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

**THIS CAUSE** is before the Court upon an evidentiary hearing on August 11 and 12, 2014. Petitioner Hernan Diego Paniagua Rodriguez filed a Petition for Return of Minor Child Pursuant to International Treaty and Federal Statute [DE 1]. The Court has considered the testimony and other evidence the parties presented, the applicable law and is duly advised in the premises. Accordingly, pursuant to the requirements of Rule 52 of the Federal Rules of Civil Procedure, the Court issues the following Findings of Fact and Conclusions of law.

### I. FINDINGS OF FACT[1]

1. Petitioner Hernan Diego Paniagua Rodriguez ("Petitioner") and Respondent Cintia Soledad Romero ("Respondent") have had an on-again, off-again romantic relationship since late 2004.

2. In January 2006, Respondent discovered she was pregnant.

3. Petitioner was initially unhappy with the pregnancy because he did not want to

---

[1] Any of the foregoing factual findings that may represent conclusions of law are adopted as conclusions of law.

be a father and urged Respondent to have an abortion.  Respondent refused.

4. During a weekend trip to El Tigre Island, Petitioner coerced Respondent into taking pills which would abort the pregnancy.  The pills failed to abort the pregnancy.

5. The child, B.V.P. (the "Child"), was born on October 24, 2006.  At this time, Respondent and Petitioner were estranged.  Petitioner was not present for the birth. Instead, Petitioner had traveled to southern Argentina for work.  When the Child was born, she was given her mother's surname, Romero.

6. Petitioner did not meet the Child until she was a month old.

7. In early 2007, Petitioner and Respondent reconciled.  They rented an apartment together near the home of Respondent's father and lived there with the Child.

8. The relationship between Petitioner and Respondent was peaceful until August 2007.  In or around this time, the couple began to argue.  Petitioner was physically violent with Respondent on at least one occasion, grabbing her by the neck while she was holding the Child.

9. The couple separated in September 2007.  After the separation, the Child resided with the Respondent in her father's home.  During this period, Petitioner visited the Child at least once per week.

10. In or around May 2009, Respondent and Petitioner rekindled their romantic relationship.  Respondent and the Child moved in with the Petitioner at his home.

11. In or around August 2009, Petitioner officially recognized the Child as his daughter and gave her his surname, Paniagua.

12. Petitioner, Respondent, and the Child continued to reside together as a family

unit until on or around January 13, 2014.

13. On December 28, 2013, Petitioner, Respondent, and the Child traveled to Florida to attend the wedding of Respondent's brother and to visit Disneyworld.

14. On or around January 13, 2014, Respondent informed Petitioner that she intended to remain in Florida with the Child.

15. The parties stipulated that a prima facie case for wrongful retention of the Child in the United States has been established.

16. Respondent alleges that the Child faces a grave risk of psychological or physical harm if returned to Argentina.

17. Respondent testified that during the course of their relationship, Petitioner was physically violent with her on at least five or six occasions.

18. Respondent described one such violent incident where Petitioner threw her into a wall, causing her to suffer a head injury which necessitated a trip to the emergency room.

19. Respondent also testified regarding an incident that occurred in or around February 2013, where Petitioner grabbed her by the neck, choked her and later pointed a pistol at her head while the Child sat on her lap.  Respondent also stated that Petitioner pointed the gun at the Child.

20. Respondent testified that she had never reported any of the incidents of abuse to the Argentinian police or her family.

21. Respondent also never sought protection from the Argentinian courts.

22. Respondent's younger sister, Sara Romero, who often stayed as a guest in Petitioner and Respondent's home for extended periods, testified that she

witnessed physical violence between Respondent and Petitioner on several occasions.  She described one incident in particular which the Child also witnessed where Petitioner grabbed Respondent by the arm, pushed her up against a metal curtain outside of their home, and hit her neck.  When Petitioner took Respondent inside the house, Ms. Romero remained outside and could hear hitting noises emanating from the house.

23. Petitioner denied ever becoming physically violent with Respondent, other than occasionally grabbing her arm.  Petitioner also specifically denied throwing Respondent into a wall or pointing a gun at her head.

24. The Court finds that Petitioner's denial of Respondent's claims of physical violence lack credibility.  Moreover, the Court finds the testimony of both Respondent and her sister, Sara Romero, regarding incidents of physical violence the Petitioner directed towards Respondent, credible.

25. The Child reported seeing her father point a gun at her mother during her interview with Respondent's expert, Dr. Celia Quintas.

26. The Court finds it likely that the Child witnessed the incident with the gun, but cannot conclude that the gun was ever pointed at the Child or that the Child was sitting in her mother's lap during the incident.

27. Respondent also testified regarding verbal abuse she suffered from Petitioner during the course of their relationship.

28. Petitioner denied ever being verbally abusive to Respondent.

29. The Child reported to Dr. Celia Quintas that she had heard arguments between her parents.

30. The Court also finds Respondent's testimony regarding the verbal abuse she suffered from Petitioner credible and Petitioner's testimony denying verbal abuse not credible.

31. The Court also believes it is likely that the Child witnessed some of the verbal abuse that Petitioner directed towards Respondent.

32. There was no evidence presented that Petitioner was ever physically violent towards the Child.

33. There was no evidence presented that Petitioner was ever verbally abusive towards the Child.

34. While this case was pending, Respondent agreed to unsupervised visitation between Petitioner and the Child.

35. Respondent retained Celia Quintas, Ph.D., a licensed mental health counselor, to conduct a psycho social evaluation of the Child.

36. To prepare her evaluation, Dr. Quintas met with the Child twice, for two hours each session.

37. Dr. Quintas did not interview anyone else, including either Respondent or Petitioner, before she prepared her report.

38. Dr. Quintas also conceded on cross examination that she is not a licensed psychologist.

39. Dr. Quintas concluded that the Child is suffering post traumatic stress disorder and anxiety disorder not otherwise specified.

40. She testified that she believed that the Child would suffer psychological harm if she was sent back to Argentina before she received counseling.

41. Dr. Quintas also testified that it would be harmful to return the Child to Argentina because she believed that this would result in the separation of Respondent and her child.[2]

42. Dr. Quintas conceded on cross examination that the Child would not suffer any harm if she returned to Argentina and lived with her mother.

43. Petitioner's rebuttal expert, Dr. Glenn Caddy, Ph.D., a licensed psychologist, disagreed with Dr. Quintas' diagnosis of post traumatic stress disorder. He testified that there was no evidence to support such a diagnosis.

44. Specifically, Dr. Caddy testified that if the Child were suffering from post traumatic stress disorder, she would have fear and dread of seeing her father, massive sleep disturbances, difficulty coping with her new life in the United States, and would be nervous and reluctant to separate from her mother. To the contrary, Dr. Caddy found the Child to be well adjusted, sweet and sensitive.

45. Dr. Caddy did agree with Dr. Quintas that the Child suffers from anxiety related to the conflict between her parents. He also cannot rule out that the Child witnessed her father abuse her mother. But, he believes that there is no danger to the Child psychologically or physically if she is returned to Argentina and that she does not need to be protected from her father.

---

[2] It is not clear where Dr. Quintas got the idea that the Respondent would choose to remain in the United States if the Court ordered the Child returned to Argentina. But, as stated on the record during the Evidentiary Hearing, this Court's analysis is limited solely to the issue of whether returning the Child to Argentina would expose her to grave physical or psychological harm. This Court is without authority to determine whether Respondent remains in the United States or accompanies her daughter back to Argentina.

46. Dr. Caddy also agreed that there would be some value to the Child and father receiving counseling to help repair their relationship.

47. The Court gives no weight to Dr. Quintas' conclusion that the Child suffers from post traumatic stress disorder. Dr. Quintas failed to cite evidence to support this diagnosis.

48. Petitioner introduced videos of his recent interactions with the Child over the past month. The Court found the exchanges between father and daughter in the videos to be easy, affectionate, and natural.

49. There is no evidence that the Child cannot receive the counseling Dr. Quintas believes she requires in Argentina.

50. The Court finds Dr. Caddy's conclusion that the Child faces no psychological or physical harm if she is returned to Argentina should be given great weight.

51. Although Petitioner has a temper and has directed physical and verbal abuse towards Respondent, the Court does not find by clear and convincing evidence that the Child will experience a grave risk of harm if the Child is returned to Argentina.

## II. CONCLUSIONS OF LAW[3]

### A. Legal Standard.

The Petition is brought under the Hague Convention on the Civil Aspects of International Child Abduction and the International Child Abduction Remedies Act, 42 U.S.C. § 11601, *et seq.* ("ICARA"). ICARA was created "to protect children

---

[3] Any of the foregoing conclusions of law that may represent factual findings are adopted as factual findings.

internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access." In Re Ahumada Cabrera, 323 F. Supp. 2d 1303, 1310 (S.D. Fla. 2004) (quoting Hague Convention introduction). A court which hears an ICARA petition has jurisdiction over the wrongful retention or removal claim only, not the underlying custody dispute. Id. (citing Lops v. Lops, 140 F.3d 927, 936 (11th Cir. 1998)); see also 42 U.S.C. § 11601(b)(4); Ruiz v. Tenorio, 392 F.3d 1247, 1250 (11th Cir. 2004).

To obtain relief under ICARA, a petitioner must demonstrate that a child was wrongfully removed or retained by a preponderance of the evidence. 42 U.S.C. § 11603(e)(1)(A). A prima facie case is demonstrated where:

> (1) the habitual residence of the child immediately before the wrongful removal or retention was in a foreign country;
>
> (2) the removal or retention is a breach of the custody rights under the foreign country's laws; and
>
> (3) the petitioner was exercising custody rights at the time of the alleged wrongful removal or retention.

In Re Ahumada Cabrera, 323 F. Supp. 2d at 1310. If the petitioner satisfies this burden, the child must be returned to his or her country of habitual residence unless the respondent can establish one of the following affirmative defenses:

> (1) the proceeding was commenced more than one year after the removal of the child and the child has become settled in his or her new environment;
>
> (2) the person seeking return of the child consented to or subsequently acquiesced in the removal or retention;
>
> (3) there is a grave risk that the return of the child would

8

>> expose it to physical or psychological harm; or
>
>> (4) the return of the child would not be permitted under the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms.

Id. (citing Furnes v. Reeves, 362 F.3d 702, 712 (11th Cir. 2004)). The first two affirmative defenses need only be established by a preponderance of the evidence. The last two affirmative defenses must be established by clear and convincing evidence. Id. at 1310 n.1 (citing Furnes, 362 F.3d at 712 n.8). These affirmative defenses have been described as "narrow" and "a federal court retains, and should use when appropriate, the discretion to return a child, despite the existence of a defense, if return would further the aims of the Convention." Id. (quoting Friedrich v. Friedrich, 78 F.3d 1060, 1067 (6th Cir. 1996)).

### B. Grave Risk Affirmative Defense.

Here, the parties stipulated that a prima facie case was established. Additionally, Respondent pled the affirmative defense that return of the child to Argentina would expose her to grave risk of psychological or physical harm. Thus, this case proceeded to evidentiary hearing solely on the issue of whether Respondent, the parent opposing return, could prove this defense by clear and convincing evidence. Upon review of all the evidence presented, the Court concludes that Respondent has failed to meet this burden. Although the Court found Respondent to be a more credible witness than Petitioner, the physical abuse Respondent testified to was sporadic at best, five or six incidents over a ten year period.[4] Moreover, there was no evidence

---

[4] In finding that the physical abuse Respondent suffered was sporadic, the Court in no way condones domestic abuse of any kind.

9

introduced that demonstrates that Petitioner has ever physically abused the Child. Thus, Respondent has failed to establish by clear and convincing evidence that the Child's return to Argentina would subject the Child to a grave risk of physical harm.

Turning to the issue of psychological harm, while the Court found Respondent's testimony regarding verbal and physical abuse she had suffered credible and that the Child had witnessed some of this abuse, Respondent has also failed to meet her burden of showing that there is a grave risk of psychological harm if the Child is returned to Argentina. The Court assigns little weight to Dr. Quintas' diagnosis of the Child with post traumatic stress disorder. Moreover, the Court assigns great weight to Dr. Caddy's conclusion that the Child faces no psychological harm if returned to Argentina and does not require protection from the Petitioner. The mere fact that the Child suffers anxiety related to the conflict between her parents is not the type of grave harm which would prevent the Child's return to Argentina. Finally, there is no reason why the Child cannot receive counseling in Argentina to address any abuse she has witnessed and anxiety she suffers from.

### C. Undertakings.

To ensure that there is no future risk of grave harm to the Child, the Court will condition the Child's return upon certain undertakings. First, the Court requires that the Petitioner, Respondent, and Child receive psychological counseling upon their return to Argentina, at Petitioner's expense, to deal with issues related to the functioning of the family. Second, the Court orders Petitioner to undergo anger management counseling or some other form of counseling to deal with his angry outbursts toward Respondent. Third, at the parties' request, the Court will condition the Child's return upon the parties'

agreed upon visitation schedule for the Child and Petitioner providing Respondent with a rental housing allowance.

### III. CONCLUSION

For the foregoing reasons, it is **ORDERED AND ADJUDGED** as follows:

1. The Court will enter a separate Final Judgment granting the Petition for Return of Minor Child Pursuant to International Treaty and Federal Statute [DE 1] consistent with the Court's Findings of Fact and Conclusions of Law;

2. The Return is conditioned on the undertaking that the Petitioner, Respondent, and the Child receive psychological counseling in Argentina, at the Petitioner's expense;

3. Petitioner shall also undergo anger management counseling or some other form of counseling to deal with his angry outbursts towards the Respondent; and

4. Pending further order of an Argentine court, the Child shall reside with Respondent, and Petitioner shall have the Child with him after school and overnight one weekday each week, and every other weekend, at a minimum, and the parties may agree to additional visitation; and Petitioner shall provide up to $2000 (Argentine pesos) per month to go toward rental housing for Respondent and the Child.[5]

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida this 14th day of August, 2014.

_____
JAMES I. COHN
United States District Judge

---

[5] The parties jointly requested that the Court included this language in the Court's Findings of Fact and Conclusions of Law.

Copies provided to counsel of record via CM/ECF.